[No. G042911. Fourth Dist., Div. Three. June 2, 2010.]

TERRY MABRY et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
AURORA LOAN SERVICES et al., Real Parties in Interest.

210

**COUNSEL**

Law Offices of Moses S. Hall and Moses S. Hall for Petitioners.

No appearance for Respondent.

Akerman Senterfitt, Justin D. Balser and Donald M. Scotten for Real Party in Interest Aurora Loan Services.

McCarthy & Holthus, Matthew Podmenik, Charles E. Bell and Melissa Robbins Coutts for Real Party in Interest Quality Loan Service Corporation.

Bryan Cave, Douglas E. Winter, Christopher L. Dueringer, Sean D. Muntz and Kamao C. Shaw for Bank of America and BAC Home Loans Servicing as Amici Curiae on behalf of Real Parties in Interest.

Wright, Finlay & Zak, Thomas Robert Finlay and Jennifer A. Johnson for United Trustees Association and California Mortgage Association as Amici Curiae on behalf of Real Parties in Interest.

Leland Chan for California Bankers Association as Amicus Curiae on behalf of Real Parties in Interest.

**OPINION**

**SILLS, P. J.—**

## I. SUMMARY

Civil Code section 2923.5 requires, before a notice of default may be filed, that a lender contact the borrower in person or by phone to "assess" the

borrower's financial situation and "explore" options to prevent foreclosure. Here is the exact, operative language from the statute: "(2) A mortgagee, beneficiary, or authorized agent shall contact the borrower in person or by telephone in order to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure."[1] There is nothing in section 2923.5 that requires the lender to rewrite or modify the loan.

In this writ proceeding, we answer these questions about section 2923.5, also known as the Perata Mortgage Relief Act[2]:

■ (A) *May section 2923.5 be enforced by a private right of action?* Yes. Otherwise the statute would be a dead letter.

(B) *Must a borrower tender the full amount of the mortgage indebtedness due as a prerequisite to bringing an action under section 2923.5?* No. To hold otherwise would defeat the purpose of the statute.

(C) *Is section 2923.5 preempted by federal law?* No—but, we must emphasize, it is not preempted because the remedy for noncompliance is a simple postponement of the foreclosure sale, nothing more.

(D) *What is the extent of a private right of action under section 2923.5?* To repeat: The right of action is limited to obtaining a postponement of an impending foreclosure to permit the lender to comply with section 2923.5.

(E) *Must the declaration required of the lender by section 2923.5, subdivision (b) be under penalty of perjury?* No. Such a requirement is not only *not* in the statute, but would be at odds with the way the statute is written.

(F) *Does a declaration in a notice of default that tracks the language of section 2923.5, subdivision (b) comply with the statute, even though such language does not on its face delineate precisely which one of the three categories set forth in the declaration applies to the particular case at hand?* Yes. There is no indication that the Legislature wanted to saddle lenders with the need to "custom draft" the statement required by the statute in notices of default.

■ (G) *If a lender did not comply with section 2923.5 and a foreclosure sale has already been held, does that noncompliance affect the title to the*

---

[1] All further undesignated statutory references will be to the Civil Code. We will quote relevant portions of the text of section 2923.5 in part III.A. of this opinion.

[2] We do not address the content of any legislation that may now be making its way through the Legislature which may amend, supplement or otherwise modify section 2923.5.

*foreclosed property obtained by the families or investors who may have bought the property at the foreclosure sale?* No. The Legislature did nothing to affect the rule regarding foreclosure sales as final.

■ (H) *In the present case, did the lender comply with section 2923.5?* We cannot say on this record, and therefore must return the case to the trial court to determine which of the two sides is telling the truth. According to the lender, the borrowers themselves initiated a telephone conversation in which foreclosure-avoidance options were discussed, and there were many, many phone calls to the borrowers to attempt to discuss foreclosure-avoidance options. According to the borrowers, no one ever contacted them about nonforeclosure options. The trial judge, however, never reached this conflict in the facts, because he ruled strictly on legal grounds: namely (1) that section 2923.5 does not provide for a private right of action and (2) section 2923.5 is preempted by federal law. As indicated, we have concluded otherwise as to those two issues.

■ (I) *Can section 2923.5 be enforced in a class action in this case?* Not under these facts. The operation of section 2923.5 is highly fact specific, and the details as to what might, or might not, constitute compliance can readily vary from lender to lender and borrower to borrower.

## II. BACKGROUND

In December 2006, Terry and Michael Mabry refinanced the loan on their home in Corona from Paul Financial, borrowing about $700,000. In April 2008, Paul Financial assigned to Aurora Loan Services the right to service the loan. In this opinion, we will treat Aurora as synonymous with the lender and use the terms interchangeably.[3]

*According to the lender*, in mid-July 2008—before the Mabrys missed their August 2008 loan payment—the couple called Aurora on the telephone to discuss the loan with an Aurora employee. The discussion included mention of a number of options to avoid foreclosure, including loan modification, short sale, deed in lieu of foreclosure, and even a special forbearance. The Aurora employee sent a letter following up on the conversation. The letter explained the various options to avoid foreclosure, and asked the Mabrys to forward current financial information to Aurora so it could consider the Mabrys for these options.

*According to the lender*, the Mabrys missed their September 2008 payment as well, and midmonth Aurora sent them another letter describing ways to

---

[3] Aurora Loan Services will be referred to as Aurora. We also do not burden readers with the technical distinctions in mortgage law between mortgagors, mortgagees, trustors, or trustees. For purposes of this case, there are only two categories, lenders and borrowers.

avoid foreclosure. Aurora employees called the Mabrys "many times" to discuss the situation. The Mabrys never picked up.

*It is undisputed* that later in September, the Mabrys filed chapter 11 bankruptcy and Aurora did not contact the Mabrys while the bankruptcy was pending. (See 11 U.S.C. § 362 [automatic stay].) The Mabrys had their chapter 11 case dismissed, however, in late March 2009.

*According to the lender*, Aurora once again began trying to call the Mabrys, calling them "numerous times," including "three times on different days." Meanwhile, in mid-April the Mabrys sent an authorization to discuss the loan with their lawyers.

*According to the lender*, finally, in June, the *Mabrys* sent two faxes to Aurora, the aggregate effect of which was to propose a short sale to the Mabrys' attorney, Moses S. Hall, for $350,000. If accepted, the short sale would have meant a loss of over $400,000 on the loan. Aurora rejected that offer, and an attorney in Hall's law office proposed a sale price of $425,000, which would have meant a loss to the lender of about $340,000.

*It is undisputed* that on June 18, 2009, Aurora recorded a notice of default. The notice of default used this (obviously form) language: "The Beneficiary or its designated agent declares that it has contacted the borrower, tried with due diligence to contact the borrower as required by California Civil Code section 2923.5, or the borrower has surrendered the property to the beneficiary or authorized agent, or is otherwise exempt from the requirements of section 2923.5." Aurora sent six copies of the recorded notice of default to the Mabrys' home by certified mail, and the certifications showed they were delivered.

*It is also undisputed that* on October 7, the Mabrys filed a complaint in Orange County Superior Court based on Aurora's alleged failure to comply with section 2923.5.

*According to the borrowers*, no one had *ever* contacted them about their foreclosure options. Michael Mabry stated the following in his declaration: "We have never been contacted by Aurora nor [*sic*] any of its agents *in person, by telephone or by first class mail* to explore options for us to avoid foreclosure as required in CC § 2923.5."

The complaint sought a temporary restraining order to prevent the foreclosure sale then scheduled just a week away, on October 14, 2009. Based on the allegation of no contact, the trial court issued a temporary restraining order, and scheduled a hearing for October 20.

But exactly one week before the October 20 hearing, the Mabrys filed an amended complaint, this one specifically adding class action allegations and seeking injunctive relief for an entire class.[4] This new filing came with another request for a temporary restraining order, which was also granted, with a hearing on *that* temporary restraining order scheduled for October 27 (albeit the order was directed at Aurora only).

The first restraining order was vacated on October 20, the second on October 27. The trial judge did not, however, resolve the conflict in the facts presented by the pleadings. Rather he concluded (1) the action is preempted by federal law; (2) there is no private right of action under section 2923.5—the statute can only be enforced by members of pooling and servicing agreements; and (3) the Mabrys were required to at least tender all arrearages to enjoin any foreclosure proceedings.

The Mabrys filed a motion for reconsideration and a third request for a restraining order based on supposedly new law. The new law was a now review granted Court of Appeal opinion which, let us merely note here, appears to have been quite off point in regards to any issue which the trial judge had just decided. So it is not surprising that the requested restraining order was denied. The foreclosure sale was now scheduled for November 30, 2009. Six days before that, though, the Mabrys filed this writ proceeding, and two days later this court stayed all proceedings. We invited amici curiae to give their views on the issues raised by the petition, and subsequently scheduled an order to show cause to consider those issues.

## III. DISCUSSION

### A. Private Right of Action? Yes

#### 1. *Preliminary Considerations*

■ A private right of action may inhere within a statute, otherwise silent on the point, when such a private right of action is necessary to achieve the statute's policy objectives. (E.g., *Cannon v. University of Chicago* (1979) 441 U.S. 677, 683 [60 L.Ed.2d 560, 99 S.Ct. 1946] [implying private right of action into tit. IX of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) because such a right was necessary to achieve the statute's policy objectives];

---

[4] Which is interesting by itself. The original complaint was *clearly* drafted to be a class action vehicle. The caption listed what appeared to be pretty much everybody in the real estate financing business in California, but the text of the original complaint merely asserted that the defendants in the case were "doing business as primary real estate lenders." It contained none of the plaintiff-is-a-proper-representative-of-the-class allegations one typically sees in class action pleadings.

*Basic Inc. v. Levinson* (1988) 485 U.S. 224, 230–231 [99 L.Ed.2d 194, 108 S.Ct. 978] [implying private right of action to enforce securities statute].)

That is, the absence of an express private right of action is not necessarily preclusive of such a right. There are times when a private right of action may be implied by a statute. (E.g., *Siegel v. American Savings & Loan Assn.* (1989) 210 Cal.App.3d 953, 966 [258 Cal.Rptr. 746] ["Before we reach the issue of exhaustion of administrative remedies, we must determine, therefore, whether plaintiffs have an implied private right of action under HOLA."].)

California courts have, of recent date, looked to *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58] (*Moradi-Shalal*) for guidance as to whether there is an implied private right of action in a given statute. In *Moradi-Shalal*, for example, the presence of a *comprehensive administrative* means of enforcement of a statute was one of the reasons the court determined that there was no private right of action to enforce a statute (Ins. Code, § 790.03, subd. (h)) regulating *general* insurance industry practices. (See *Moradi-Shalal, supra,* 46 Cal.3d at p. 300.)

There is also a pre-*Moradi Shalal* approach, embodied in *Middlesex Ins. Co. v. Mann* (1981) 124 Cal.App.3d 558, 570 [177 Cal.Rptr. 495] (*Middlesex*). (The *Middlesex* opinion itself copied the idea from the Rest.2d Torts, § 874A.) The approach looks to whether a private remedy is "appropriate" to further the " 'purpose of the legislation' " and is " 'needed to assure the effectiveness of the provision.' " (*Middlesex, supra,* 124 Cal.App.3d at p. 570.)

Obviously, where the two approaches conflict, the one used by our high court in *Moradi-Shalal* trumps the *Middlesex* approach. But we may note at this point that as regards section 2923.5, there is no alternative administrative mechanism to enforce the statute. By contrast, in *Moradi-Shalal*, there was an existing administrative mechanism at hand (by way of the Insurance Commissioner) available to enforce section 790.03, subdivision (h) of the Insurance Code.

There are other corollary principles as well.

■ First, California courts, quite naturally, do not favor constructions of statutes that render them advisory only, or a dead letter. (E.g., *Petropoulos v. Department of Real Estate* (2006) 142 Cal.App.4th 554, 567 [47 Cal.Rptr.3d 812]; *People v. Stringham* (1988) 206 Cal.App.3d 184, 197 [253 Cal.Rptr.

484].) Our colleagues in Division One of this district nicely summarized this point in *Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 375 [17 Cal.Rptr.3d 39]: ■ "The question of whether a regulatory statute creates a private right of action depends on legislative intent. . . . In determining legislative intent, '[w]e first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. . . . The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context. . . . *These canons generally preclude judicial construction that renders part of the statute "meaningless or inoperative."* ' " (Italics added, citations omitted.)

■ Second, statutes on the same subject matter or of the same subject should be construed together so that all the parts of the statutory scheme are given effect. (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1090–1091 [103 Cal.Rptr.3d 767, 222 P.3d 214].) This canon is particularly important in the case before us, where there is an enforcement mechanism available at hand to enforce section 2923.5, in the form, as we explain below, of section 2924g. Ironically though, the enforcement mechanism at hand, in direct contrast to the one in *Moradi-Shalal,* is one that strongly implies *individual* enforcement of the statute.

■ Third, historical context can also shed light on whether the Legislature intended a private right of action in a statute. As noted by one federal district court that *has* found a private right of action in section 2923.5, the fact that a statute was enacted as an *emergency statute* is an important factor in determining legislative intent. (See *Ortiz v. Accredited Home Lenders, Inc.* (S.D.Cal. 2009) 639 F.Supp.2d 1159, 1166 [agreeing with argument that "the California legislature would not have enacted this 'urgency' legislation, intended to curb high foreclosure rates in the state, without any accompanying enforcement mechanism"]; cf. *County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 609 [79 Cal.Rptr.3d 489] [admitting that private right of action might exist, even if the Legislature did not imply one, if " 'compelling reasons of public policy' " required " 'judicial recognition of such a right' "].) Section 2923.5 was enacted in 2008 as a manifestation of a felt need for urgent action in the midst of a cascading torrent of foreclosures.

Finally, of course, there is recourse to legislative history. Alas, in this case, there is silence on the matter as regards the existence of a private right of action in the final draft of the statute, and we have been cited to nothing in the history that suggests a clear legislative intent one way or the other. (See generally *J.A. Jones Construction Co. v. Superior Court* (1994) 27 Cal.App.4th 1568, 1575 [33 Cal.Rptr.2d 206] (*J.A. Jones*) [emphasizing importance of *clear* intent appearing in legislative history].) To be sure, as we were reminded at oral argument, an early version of section 2923.5 had an

express provision for a private right of action and that provision did not make its way into the final version of the statute. And we recognize that this factor suggests the Legislature may not have wanted to have section 2923.5 enforced privately.

 On the other hand, the bottom line was an outcome of silence, not a clear statement that there should be no individual enforcement. And silence, as this court pointed out in *J.A. Jones*, has its own implications. There, we cited Professor Eskridge's work on statutory interpretation (see Eskridge, *The New Textualism* (1990) 37 UCLA L.Rev. 621, 670–671 (hereinafter *Eskridge on Textualism*)) to recognize that ambiguity in a statute may *itself* be the result of both sides in the legislative process agreeing to let the courts decide a point: "[I]f there is ambiguity it is because the legislature either could not agree on clearer language or because it made the deliberate choice to be ambiguous—in effect, the only 'intent' is to pass the matter on to the courts." (*J.A. Jones, supra*, 27 Cal.App.4th at p. 1577.) As Professor Eskridge put it elsewhere in his article: "The vast majority of the Court's difficult statutory interpretation cases involve statutes whose ambiguity is either the result of deliberate legislative choice to leave conflictual decisions to agencies or the courts . . . ." (*Eskridge on Textualism, supra*, 37 UCLA L.Rev. at p. 677.)

We have a concrete example in the case at hand. Amicus curiae, the California Bankers Association, asserts that if section 2923.5 had included an express right to a private right of action, the association would have vociferously opposed the legislation. Let us accept that as true. But let us also accept as a reasonable premise that the sponsors of the bill (Sen. Bill No. 1137 (2007–2008 Reg. Sess.)) would have vociferously opposed the legislation if it had an express prohibition on individual enforcement. The point is, the bankers did not insist on language expressly or even impliedly precluding a private right of action, or, if they did, they didn't get it. The silence is consonant with the idea that section 2923.5 was the result of a legislative compromise, with each side content to let the courts struggle with the issue.

With these observations, we now turn to the language, structure and function of the statute at issue.

### 2. *Operation of Section 2923.5*

Section 2923.5 is one of a series of detailed statutes that govern mortgages that span sections 2920 to 2967. Within that series is yet another long series

of statutes governing rules involving foreclosure.[5] This second series goes from section 2924, and then follows with sections 2924a through 2924*l*. (There is no § 2924m . . . yet.)

Section 2923.5 concerns the crucial first step in the foreclosure process: The recording of a notice of default as required by section 2924. (Just plain § 2924—this one has no lower case letter behind it.)

■ The key text of section 2923.5—"key" because of the substantive obligation it imposes on lenders—basically says that a lender cannot file a notice of default until the lender has contacted the borrower "in person or by telephone." (*Id.*, subd. (a)(2).) Thus an initial form letter won't do. To quote the text directly, lenders must contact the borrower by phone or in person to "assess the borrower's financial situation and explore options for the borrower to avoid foreclosure."[6] (§ 2923.5, subd. (a)(2).) The statute, of course, has alternative provisions in cases where the lender tries to contact a borrower, and the borrower simply won't pick up the phone, the phone has been disconnected, or the borrower hides or otherwise evades contact.[7]

---

[5] By foreclosure in this opinion, we mean nonjudicial foreclosure, which is overwhelmingly preferred by lenders—after all, they don't have to hire any lawyers to effect it.

[6] Here is subdivision (a) of section 2923.5:

"(a)(1) A mortgagee, trustee, beneficiary, or authorized agent may not file a notice of default pursuant to Section 2924 until 30 days after initial contact is made as required by paragraph (2) or 30 days after satisfying the due diligence requirements as described in subdivision (g).

"(2) A mortgagee, beneficiary, or authorized agent shall contact the borrower in person or by telephone in order to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure. During the initial contact, the mortgagee, beneficiary, or authorized agent shall advise the borrower that he or she has the right to request a subsequent meeting and, if requested, the mortgagee, beneficiary, or authorized agent shall schedule the meeting to occur within 14 days. The assessment of the borrower's financial situation and discussion of options may occur during the first contact, or at the subsequent meeting scheduled for that purpose. In either case, the borrower shall be provided the toll-free telephone number made available by the United States Department of Housing and Urban Development (HUD) to find a HUD-certified housing counseling agency. Any meeting may occur telephonically."

The need for a declaration is then spelled out in subdivision (c), which provides as follows:

"(c) If a mortgagee, trustee, beneficiary, or authorized agent had already filed the notice of default prior to the enactment of this section and did not subsequently file a notice of rescission, then the mortgagee, trustee, beneficiary, or authorized agent shall, as part of the notice of sale filed pursuant to Section 2924f, include a declaration that either:

"(1) States that the borrower was contacted to assess the borrower's financial situation and to explore options for the borrower to avoid foreclosure.

"(2) Lists the efforts made, if any, to contact the borrower in the event no contact was made."

[7] Subdivision (g) of section 2923.5 provides:

"(g) A notice of default may be filed pursuant to Section 2924 when a mortgagee, beneficiary, or authorized agent has *not contacted* a borrower as required by paragraph (2) of

 The contrast between section 2923.5 and one of its sister statutes, section 2923.6, is also significant. By its terms, section 2923.5 operates substantively on lenders. They *must* do things in order to comply with the law. In Hohfeldian language, it both creates rights and corresponding obligations.[8]

But consider section 2923.6, which does *not* operate substantively. Section 2923.6 merely expresses the *hope* that lenders will offer loan modifications on certain terms.[9] By contrast, section 2923.5 requires a specified course of

---

subdivision (a) provided that the failure to contact the borrower occurred despite the due diligence of the mortgagee, beneficiary, or authorized agent. For purposes of this section, 'due diligence' shall require and mean all of the following:

"(1) A mortgagee, beneficiary, or authorized agent shall first attempt to contact a borrower by sending a first-class letter that includes the toll-free telephone number made available by HUD to find a HUD-certified housing counseling agency.

"(2)(A) After the letter has been sent, the mortgagee, beneficiary, or authorized agent shall attempt to contact the borrower by telephone at least three times at different hours and on different days. Telephone calls shall be made to the primary telephone number on file.

"(B) A mortgagee, beneficiary, or authorized agent may attempt to contact a borrower using an automated system to dial borrowers, provided that, if the telephone call is answered, the call is connected to a live representative of the mortgagee, beneficiary, or authorized agent.

"(C) A mortgagee, beneficiary, or authorized agent satisfies the telephone contact requirements of this paragraph if it determines, after attempting contact pursuant to this paragraph, that the borrower's primary telephone number and secondary telephone number or numbers on file, if any, have been disconnected.

"(3) If the borrower does not respond within two weeks after the telephone call requirements of paragraph (2) have been satisfied, the mortgagee, beneficiary, or authorized agent shall then send a certified letter, with return receipt requested.

"(4) The mortgagee, beneficiary, or authorized agent shall provide a means for the borrower to contact it in a timely manner, including a toll-free telephone number that will provide access to a live representative during business hours.

"(5) The mortgagee, beneficiary, or authorized agent has posted a prominent link on the homepage of its Internet Web site, if any, to the following information:

"(A) Options that may be available to borrowers who are unable to afford their mortgage payments and who wish to avoid foreclosure, and instructions to borrowers advising them on steps to take to explore those options.

"(B) A list of financial documents borrowers should collect and be prepared to present to the mortgagee, beneficiary, or authorized agent when discussing options for avoiding foreclosure.

"(C) A toll-free telephone number for borrowers who wish to discuss options for avoiding foreclosure with their mortgagee, beneficiary, or authorized agent.

"(D) The toll-free telephone number made available by HUD to find a HUD-certified housing counseling agency." (Italics added.)

[8] Wesley Hohfeld was big in something called analytical jurisprudence about 100 years ago. (See O'Rourke, *Refuge From a Jurisprudence of Doubt: Hohfeldian Analysis of Constitutional Law* (2009) 61 S.C. L.Rev. 141, 142 [noting that since Hohfeld developed his " 'canonical' theory about legal rights" in 1913, by "the twenty-first century, Hohfeldian analysis had become an uncontroversial and widely used theory in private law scholarship"].)

[9] The statute conspicuously does not require lenders to take any action:

"(a) The Legislature *finds and declares* that any duty servicers *may* have to maximize net present value under their pooling and servicing agreements is owed to all parties in a loan pool, or to all investors under a pooling and servicing agreement, not to any particular party in

action. (There is a reason for the difference, as we show in part III.C., *post*, dealing with federal preemption. In a word, to have *required* loan modifications would have run afoul of federal law.)

As noted above, other steps in the foreclosure process are set forth in sections 2924a through 2924*l*. The topic of the postponement of foreclosure sales is addressed in section 2924g.

██ Subdivision (c)(1)(A) of section 2924g sets forth the grounds for postponements of foreclosure sales.[10] One of those grounds is the open-ended possibility that any court of competent jurisdiction may issue an order postponing the sale. Section 2923.5 and section 2924g, subdivision (c)(1)(A), when read together, establish a natural, logical whole, and one wholly consonant with the Legislature's intent in enacting 2923.5 to have individual borrowers and lenders "assess" and "explore" alternatives to foreclosure: If section 2923.5 is not complied with, then there is no valid notice of default and, without a valid notice of default, a foreclosure sale cannot proceed. The available, existing remedy is found in the ability of a court in section 2924g, subdivision (c)(1)(A), to postpone the sale until there has been compliance with section 2923.5. Reading section 2923.5 together with section 2924g, subdivision (c)(1)(A) gives section 2923.5 real effect. The alternative would

---

the loan pool or investor under a pooling and servicing agreement, and that a servicer acts in the best interests of all parties to the loan pool or investors in the pooling and servicing agreement *if* it agrees to or implements a loan modification or workout plan for which both of the following apply:

"(1) The loan is in payment default, or payment default is reasonably foreseeable.

"(2) Anticipated recovery under the loan modification or workout plan exceeds the anticipated recovery through foreclosure on a net present value basis.

"(b) It is the *intent* of the Legislature that the mortgagee, beneficiary, or authorized agent offer the borrower a loan modification or workout plan *if* such a modification or plan is consistent with its contractual or other authority."

"(c) This section shall remain in effect only until January 1, 2013, and as of that date is repealed, unless a later enacted statute, that is enacted before January 1, 2013, deletes or extends that date." (§ 2923.6, italics added.)

Readers will note, in contrast to section 2923.5, the conspicuously absence of any actual duties imposed on anybody in this statute. At the most, the statute seems to offer a defense to servicers of loan pools if the servicer tries—say, over the objection of an owner of a share in the pool—to implement a loan modification rather than going straight to foreclosure.

[10] Section 2924g, subdivision (c)(1) provides:

"There may be a postponement or postponements of the sale proceedings, including a postponement upon instruction by the beneficiary to the trustee that the sale proceedings be postponed, at any time prior to the completion of the sale for any period of time not to exceed a total of 365 days from the date set forth in the notice of sale. The trustee shall postpone the sale in accordance with any of the following:

"(A) Upon the order of any court of competent jurisdiction.

"(B) If stayed by operation of law.

"(C) By mutual agreement, whether oral or in writing, of any trustor and any beneficiary or any mortgagor and any mortgagee."

mean that the Legislature conferred a right on *individual* borrowers in section 2923.5 without any means of enforcing that right.

By the same token, compliance with section 2923.5 is necessarily an individualized process. After all, the details of a borrower's financial situation and the options open to a particular borrower to avoid foreclosure are going to vary, sometimes widely, from borrower to borrower. Section 2923.5 is not a statute, like subdivision (h) of section 790.03 of the Insurance Code construed in *Moradi-Shalal*, which contemplates a frequent or general business *practice*, and thus its very text is necessarily directed at those who regulate the insurance industry. (Ins. Code, § 790.03, subd. (h) begins with the words, "Knowingly committing or performing with such *frequency* as to indicate *a general business practice* any of the following unfair claims settlement practices . . . ." (italics added); see generally *Moradi-Shalal, supra,* 46 Cal.3d 287.)

Rather, in order to have its obvious goal of forcing parties *to communicate* (the statutory words are "assess" and "explore") about a borrower's situation and the options to avoid foreclosure, section 2923.5 necessarily confers an individual right. The alternative proffered by the trial court—enforcement by the servicer of pooling agreements—involves the facially unworkable problem of fitting individual situations into collective pools.

The suggestion of one amicus curiae that the Legislature intended enforcement of section 2923.5 to reside within the Attorney General's office is one of which we express no opinion. Our decision today should thus not be read as precluding such enforcement by the Attorney General's office. But we do note that the same individual-collective problem would dog Attorney General enforcement of the statute. To be sure (which is why the possibility should be left open), there might, a la Insurance Code section 790.03, subdivision (h), be lenders who systematically ignore section 2923.5, and *their* "general business practice" would be susceptible to some sort of collective enforcement. Even so, the Attorney General's office can hardly be expected to take up the cause of every individual borrower whose diverse circumstances show noncompliance with section 2923.5.[11]

---

[11] As we were reminded at oral argument, servicing pools generally have an obligation to maximize the values of the loans within the pool. So far so good. But look at the problem from the standpoint of a servicer: Maximizing value depends on context: A family struggling to stay in its home and willing to make payments to stay there and who might do well with a loan modification, even a temporary one, presents a different problem than cynical deadbeats who are intent on dragging out the process as long as they can in order to obtain de facto free rent. But differentiating the two is not amenable to collective enforcement.

### 3. *Application*

We now put the preceding ideas and factors together.

While the dropping of an express provision for private enforcement in the legislative process leading to section 2923.5 does indeed give us pause, it is outweighed by two major opposing factors. First, the very structure of section 2923.5 is inherently individual. That fact strongly suggests a legislative intention to allow individual enforcement of the statute. The statute would become a meaningless dead letter if no individual enforcement were allowed: It would mean that the Legislature created an inherently individual right and decided there was no remedy at all.

Second, when section 2923.5 was enacted as an urgency measure, there already was an existing enforcement mechanism at hand—section 2924g. There was no need to write a provision into section 2923.5 allowing a borrower to obtain a postponement of a foreclosure sale, since such a remedy was already present in section 2924g. Reading the two statutes together as allowing a remedy of postponement of foreclosure produces a logical and natural whole.

### B. Tender Full Amount of Indebtedness? No

The right conferred by section 2923.5 is a right to be contacted to "assess" and "explore" alternatives to foreclosure *prior* to a notice of default. It is enforced by the postponement of a foreclosure sale. Therefore it would defeat the purpose of the statute to require the borrower to tender the full amount of the indebtedness *prior* to any enforcement of the right to—and that's the point—the right to be *contacted* prior to the notice of default. Case law requiring payment or tender of the full amount of payment before any foreclosure sale can be postponed (e.g., *Arnolds Management Corp. v. Eischen* (1984) 158 Cal.App.3d 575, 578 [205 Cal.Rptr. 15] ["It is settled that an action to set aside a trustee's sale for irregularities in sale notice or procedure should be accompanied by an offer to pay the full amount of the debt for which the property was security."]) arises out of a paradigm where, *by definition*, there is no way that a foreclosure sale can be avoided absent payment of *all* the indebtedness. Any irregularities in the sale would necessarily be harmless to the borrower if there was no full tender. (See 4 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 9:154, pp. 507–508.) By contrast, the whole point of section 2923.5 is to create a new, even if limited, right to be contacted about the possibility of *alternatives* to full payment of arrearages. It would be contradictory to thwart the very operation of the statute if enforcement were predicated on full tender. It is well settled that statutes can modify common law rules. (E.g., *Evangelatos v. Superior Court* (1988) 44 Cal.3d

1188, 1192 [246 Cal.Rptr. 629, 753 P.2d 585] [noting that Civ. Code, §§ 1431–1431.5 had modified traditional common law doctrine of joint and several liability].)

### C. Preempted by Federal Law? No—As Long As Relief Under Section 2923.5 Is Limited to Just Postponement

#### 1. *Historical Context*

A remarkable aspect of section 2923.5 is that it appears to have been carefully drafted to avoid bumping into federal law, precisely because it is limited to affording borrowers only more time when lenders do not comply with the statute. To explain that, though, we need to make a digression into state debtors' relief acts as they have manifested themselves in four previous periods of economic distress.

The first period of economic distress was the depression of the mid-1780's that played a large part in engendering the United States Constitution in the first place. As Chief Justice Charles Evans Hughes would later note for a majority of the United States Supreme Court, there was "widespread distress following the revolutionary period, and the plight of debtors, had called forth in the States an ignoble array of legislative schemes for the defeat of creditors and the invasion of contractual obligations." (*Home Bldg. & L. Assn. v. Blaisdell* (1934) 290 U.S. 398, 427 [78 L.Ed. 413, 54 S.Ct. 231] (*Blaisdell*).) Consequently, the federal Constitution of 1789 contains the contracts clause, which forbids states from impairing contracts. (See Siegel, *Understanding the Nineteenth Century Contract Clause: The Role of the Property-Privilege Distinction and "Takings" Clause Jurisprudence* (1986) 60 So.Cal. L.Rev. 1, 21, fn. 86 ["Although debtor relief legislation was frequently enacted in the Confederation era, it was intensely opposed. It was among the chief motivations for the convening of the Philadelphia convention, and the Constitution drafted there was designed to eliminate such legislation through a variety of means."].)

The second period of distress arose out of the panic of 1837, which prompted, in 1841, the Illinois State Legislature to enact legislation severely restricting foreclosures.[12] The legislation (1) gave debtors 12 months after any foreclosure sale to redeem the property; and (2) prevented any foreclosure sale in the first place unless the sale fetched at least two-thirds of the appraised value of the property. (See *Bronson v. Kinzie* (1843) 42 U.S. 311 [11 L.Ed. 143] (*Bronson*); *Blaisdell, supra,* 290 U.S. at p. 431.) In an opinion,

---

[12] Abraham Lincoln was in the legislature at the time. It is not readily known how he voted on the legislation.

the main theme of which is the interrelationship between contract rights and legal remedies to enforce those rights (see generally *Bronson, supra,* 42 U.S. at pp. 315–321), the *Bronson* court reasoned that the Illinois legislation had effectively destroyed the contract rights of the lender as regards a mortgage made in 1838. (See *id.* at p. 317 ["the obligation of the contract, and the rights of a party under it, may, in effect, be destroyed by denying a remedy altogether . . ."].)

The third period of distress was, of course, the Great Depression of the 1930's. In 1933, the Minnesota Legislature enacted a mortgage moratorium law that extended the period of redemption under Minnesota law until 1935. (See *Blaisdell, supra,* 290 U.S. at pp. 415–416.) But—and the high court majority found this significant—the law required debtors, in applying for an extension of the redemption period—to pay the reasonable value of the income of the property, or reasonable rental value if it didn't produce income. (*Id.* at pp. 416–417.) The legislation was famously upheld in *Blaisdell.* In distinguishing *Bronson,* the *Blaisdell* majority made the point that the statute did not *substantively* impair the debt the way the legislation in *Bronson* had: "The statute," said the court, "does not impair the integrity of the mortgage indebtedness." (*Id.* at p. 425.) The court went on to emphasize the need to pay the fair rental value of the property, which, it noted, was "the equivalent of possession during the extended period."[13] (290 U.S. at p. 425.)

Finally, the fourth period was within the living memory of many readers, namely, the extraordinary inflation and high interest rates of the late 1970's. That period engendered *Fidelity Federal Sav. & Loan Assn. v. de la Cuesta* (1982) 458 U.S. 141 [73 L.Ed.2d 664, 102 S.Ct. 3014] (*de la Cuesta*). Many mortgages had (still have) what is known as a "due-on-sale" clause. As it played out in the 1970's, the clause effectively required any buyer of a new home to obtain a new loan, but *at* the then very high market interest rates. To circumvent the need for a new high rate mortgage, creative wraparound financing was invented where a buyer would assume the obligation of the old mortgage, but that required the due-on-sale clause not be enforced.

---

[13] Here is the relevant passage emphasizing the way the statute did *not* impair the "integrity" of the mortgage indebtedness: "The statute does not impair the integrity of the mortgage indebtedness. The *obligation for interest remains.* The statute does not affect the *validity of the sale* or the right of a mortgagee-purchaser to title in fee, or his right to obtain a deficiency judgment, if the mortgagor fails to redeem within the prescribed period. *Aside from the extension of time, the other conditions of redemption are unaltered. While the mortgagor remains in possession, he must pay the rental value as that value has been determined,* upon notice and hearing, by the court. The rental value so paid is devoted to the carrying of the property by the application of the required payments to taxes, insurance, and interest on the mortgage indebtedness. While the mortgagee-purchaser is debarred from actual possession, he has, *so far as rental value is concerned, the equivalent of possession during the extended period.*" (*Blaisdell, supra,* 290 U.S. at p. 425, italics added.)

An earlier decision of the California Supreme Court, *Wellenkamp v. Bank of America* (1978) 21 Cal.3d 943 [148 Cal.Rptr. 379, 582 P.2d 970], had encouraged this sort of creative financing by holding that due-on-sale clauses violated California state law as an unreasonable restraint on alienation. Despite that precedent, the trial judge in the *de la Cuesta* case (Edward J. Wallin, who would later join this court) held that regulations issued by the Federal Home Loan Bank Board, by the authority of the Home Owners' Loan Act of 1933[14] (12 U.S.C. § 1461 et seq.) preempted state law that invalidated the due-on-sale clause. A California appellate court in the Fourth District (in an opinion by Justice Marcus Kaufman, who would later join the California Supreme Court) reversed the trial court. The United States Supreme Court, however, agreed with Judge Wallin's determination, and reversed the appellate judgment and squarely held the state law to be preempted.

The *de la Cuesta* court observed that the bank board's regulations were plain—"even" the California appellate court had been required to recognize that. (*de la Cuesta, supra,* 458 U.S. at p. 154.) On top of the express preemption, Congress had expressed no intent to limit the bank board's authority to "regulate the lending practices of federal savings and loans." (*Id.* at p. 161.) Further, going into the history of the Home Owners' Loan Act of 1933, the *de la Cuesta* court pointed out that "mortgage lending practices" are a "critical" aspect of a savings and loan's " 'operation,' " and the Home Loan Bank Board had issued the due-on-sale regulations in order to protect the economic solvency of such lenders. (See 458 U.S. at pp. 167–168.) In what is perhaps the most significant part of the rationale for our purposes, the bank board had concluded that "the due-on-sale clause is 'an important part of the mortgage contract,' " consequently its elimination would have an adverse effect on the "financial stability" of federally chartered lenders. (*Id.* at p. 168.) For example, invalidation of the due-on-sale clause would make it hard for savings and loans "to sell their loans in the secondary markets." (*Ibid.*)

With this history behind us, we now turn to the actual regulations at issue in the case before us.

### 2. The HOLA Regulations

 Under the Home Owners' Loan Act of 1933 (12 U.S.C. § 1461 et seq.) the federal Office of Thrift Supervision[15] has issued section 560.2 of title 12 of the Code of Federal Regulations (2010), a regulation that itself delineates what is a matter for federal regulation, and what is a matter for

---

[14] Like much federal legislation, it has an acronym ending in "a"—in this case "HOLA."

[15] The acronym is OTS.

state law.[16] Interestingly enough, Regs. section 560.2 is written in the form of examples, using the *"ejusdem generis"* approach of requiring a court to figure out what is, and what is not, in the same general class or category as the items given in the example.

On the preempted side, Regs. section 560.2 includes:

—"terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate" (§ 560.2(b)(4));

—"balance, payments due, or term to maturity of the loan" (§ 560.2(b)(4)); and, most importantly for this case,

---

[16] All further references to "Regs. section 560.2" will be to title 12 of the Code of Federal Regulations (2010).

Here is the complete text of Regs. section 560.2:

"(a) Occupation of field. Pursuant to sections 4(a) and 5(a) of the HOLA, 12 U.S.C. 1463(a), 1464(a), OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations when deemed appropriate to facilitate the safe and sound operation of federal savings associations, to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA. To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), *OTS hereby occupies the entire field of lending regulation for federal savings associations.* OTS intends to give *federal savings associations maximum flexibility to exercise their lending powers* in accordance with a uniform federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section or § 560.110 of this part. For purposes of this section, 'state law' includes any state statute, regulation, ruling, order or judicial decision.

"(b) Illustrative examples. Except as provided in § 560.110 of this part, the types of state laws preempted by paragraph (a) of this section include, without limitation, state laws purporting to impose requirements regarding:

"(1) Licensing, registration, filings, or reports by creditors;

"(2) The ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements;

"(3) Loan-to-value ratios;

"(4) The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;

"(5) Loan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees;

"(6) Escrow accounts, impound accounts, and similar accounts;

"(7) Security property, including leaseholds;

"(8) Access to and use of credit reports;

—the "processing, origination, *servicing,* sale or purchase of, or investment or participation in, mortgages." (§ 560.2(b)(10), italics added.)

On the other side, left for the state courts, is "Real property law." (Regs. § 560.2(c)(2).)

■ We agree with the Mabrys that the *process of foreclosure* has traditionally been a matter of state real property law, a point noted both by the United States Supreme Court in *BFP v. Resolution Trust Corporation* (1994) 511 U.S. 531, 541–542 [128 L.Ed.2d 556, 114 S.Ct. 1757],[17] and academic commentators (e.g., Alexander, *Federal Intervention in Real Estate*

---

"(9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants;

"(10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;

"(11) Disbursements and repayments;

"(12) Usury and interest rate ceilings to the extent provided in 12 U.S.C. 1735f-7a and part 590 of this chapter and 12 U.S.C. 1463(g) and § 560.110 of this part; and

"(13) Due-on-sale clauses to the extent provided in 12 U.S.C. 1701j-3 and part 591 of this chapter.

"(c) State laws that are not preempted. State laws of the following types are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section:

"(1) Contract and commercial law;

"(2) *Real property law*;

"(3) Homestead laws specified in 12 U.S.C. 1462a(f);

"(4) Tort law;

"(5) Criminal law; and

"(6) Any other law that OTS, upon review, finds:

"(i) Furthers a vital state interest; and

"(ii) Either has *only an incidental effect on lending operations* or is not otherwise contrary to the purposes expressed in paragraph (a) of this section." (Italics added.)

[17] Here is the relevant (and interesting) passage, giving a quick primer on foreclosure law. (Citations are replaced with ellipses for easier reading.)

"The history of foreclosure law also begins in England, where courts of chancery developed the 'equity of redemption'—the equitable right of a borrower to buy back, or redeem, property conveyed as security by paying the secured debt on a later date than 'law day,' the original due date. The courts' continued expansion of the period of redemption left lenders in a quandary, since title to forfeited property could remain clouded for years after law day. To meet this problem, courts created the equitable remedy of foreclosure: after a certain date the borrower would be forever foreclosed from exercising his equity of redemption. This remedy was called strict foreclosure because the borrower's entire interest in the property was forfeited, regardless of any accumulated equity. . . . The next major change took place in 19th-century America, with the development of foreclosure by sale (with the surplus over the debt refunded to the debtor) as a means of avoiding the draconian consequences of strict foreclosure. . . . *Since then, the States have created diverse networks of judicially and legislatively crafted rules governing the foreclosure process, to achieve what each of them considers the proper balance between the needs of lenders and borrowers.* All States permit judicial foreclosure, conducted under direct judicial oversight; about half of the States also permit foreclosure by exercising a

*Finance: Preemption and Federal Common Law* (1993) 71 N.C. L.Rev. 293 ["Historically, real property law has been the exclusive domain of the states." (italics omitted)]), including at least one law professor who laments that diverse state foreclosure laws tend to hinder efforts to achieve banking stability at the national level. (See Nelson, *Confronting the Mortgage Meltdown: A Brief for the Federalization of State Mortgage Foreclosure Law* (2010) 37 Pepp. L.Rev. 583, 588–590 [noting that mortgage foreclosure law varies from state to state, and advocating federalization of mortgage foreclosure law].) By contrast, we have not been cited to anything in the federal regulations that governs such things as initiation of foreclosure, notice of foreclosure sales, allowable times until foreclosure, or redemption periods. (Though there are commentators, like Professor Nelson, who argue there should be.)

Given the traditional state control over mortgage foreclosure laws, it is logical to conclude that if the Office of Thrift Supervision wanted to include foreclosure as within the preempted category of *loan servicing*, it would have been explicit. Nothing prevented the office from simply adding the words "foreclosure of" to Regs. section 560.2(b)(10).

### D. The Extent of Section 2923.5? More Time and Only More Time

■■■ State law should be construed, whenever possible, to be in harmony with federal law, so as to avoid having the state law invalidated by federal preemption. (See *Greater Westchester Homeowners Assn. v. City of Los Angeles* (1979) 26 Cal.3d 86, 93 [160 Cal.Rptr. 733, 603 P.2d 1329]; *California Arco Distributors, Inc. v. Atlantic Richfield Co.* (1984) 158 Cal.App.3d 349, 359 [204 Cal.Rptr. 743].)

We emphasize that we are able to come to our conclusion that section 2923.5 is not preempted by federal banking regulations because it *is*, or can be construed to be, very narrow. As mentioned above, there is no *right*, for example, under the statute, to a loan modification.

---

private power of sale provided in the mortgage documents. . . . Foreclosure laws typically require notice to the defaulting borrower, a substantial lead time before the commencement of foreclosure proceedings, publication of a notice of sale, and strict adherence to prescribed bidding rules and auction procedures. Many States require that the auction be conducted by a government official, and some forbid the property to be sold for less than a specified fraction of a mandatory presale fair-market-value appraisal. . . . When these procedures have been followed, however, it is "black letter" law that mere inadequacy of the foreclosure sale price is no basis for setting the sale aside, though it may be set aside (under state foreclosure law, rather than fraudulent transfer law) if the price is so low as to 'shock the conscience or raise a presumption of fraud or unfairness.' " (*BFP v. Resolution Trust Corporation, supra,* 511 U.S. at pp. 541–542, italics added & deleted, citations omitted.)

A few more comments on the scope of the statute:

■ First, to the degree that the words "assess" and "explore" can be narrowly or expansively construed, they must be narrowly construed in order to avoid crossing the line from state foreclosure law into federally preempted loan servicing. Hence, any "assessment" must necessarily be simple—something on the order of, "why can't you make your payments?" The statute cannot require the lender to consider a whole new loan application or take detailed loan application information over the phone. (Or, as is unlikely, in person.)

Second, the same goes for any "exploration" of options to avoid foreclosure. Exploration must necessarily be limited to merely telling the borrower the traditional ways that foreclosure can be avoided (e.g., deeds "in lieu," workouts, or short sales), as distinct from requiring the lender to engage in a process that would be functionally indistinguishable from taking a loan application in the first place. In this regard, we note that section 2923.5, subdivision (a)(2) directs lenders to *refer* the borrower to "the toll-free telephone number made available by the United States Department of Housing and Urban Development (HUD) to find a HUD-certified housing counseling agency." The obvious implication of the statute's referral clause is that the lender itself does not have any duty to become a loan counselor.

Finally, to the degree that the "assessment" or "exploration" requirements impose, in practice, burdens on federal savings banks that might arguably push the statute out of the permissible category of state foreclosure law and into the federally preempted category of loan servicing or loan making, *evidence* of such a burden is necessary before the argument can be persuasive. For the time being, and certainly on this record, we cannot say that section 2923.5, narrowly construed, strays over the line.

■ Given such a narrow construction, section 2923.5 does not, as the law in *Blaisdell* did not, affect the "integrity" of the basic debt. (Cf. *Lopez v. World Savings & Loan Assn.* (2003) 105 Cal.App.4th 729 [130 Cal.Rptr.2d 42] [§ 560.2 preempted state law that capped payoff demand statement fees].)

### E. The Wording of the Declaration: Okay if Not Under Penalty of Perjury

■ In addition to the substantive act of contacting the borrower, section 2923.5 requires a statement in the notice of default. The statement is found in section 2923.5, subdivision (b), which we quote here: "(b) A notice of default filed pursuant to Section 2924 shall include *a declaration* that the mortgagee, beneficiary, or authorized agent has contacted the borrower, has tried with

due diligence to contact the borrower as required by this section, or that no contact was required pursuant to subdivision (h)." (Italics added.)

The idea that this "declaration" must be made under oath must be rejected. First, ordinary English usage of the word "declaration" imports no requirement that it be under oath. In the Oxford English Dictionary, for example, numerous definitions of the word are found, none of which require a statement under oath or penalty of perjury. In fact, the second legal definition given actually juxtaposes the idea of a declaration against the idea of a statement under oath: "A simple affirmation allowed to be taken, in certain cases, instead of an oath or solemn affirmation." (4 Oxford English Dict. (2d ed. 1991) p. 336.)

Second, even the venerable Black's Law Dictionary doesn't define "declaration" to necessarily be under oath. Its very first definition of the word is: "A formal statement, proclamation, or announcement, esp. one embodied in an instrument." (Black's Law Dict. (9th ed. 2009) p. 467.)

Third, if the Legislature wanted to say that the statement required in section 2923.5 must be under penalty of perjury, it knew how to do so. The words "penalty of perjury" are used in other laws governing mortgages. (E.g., § 2941.7, subd. (b) ["The declaration provided for in this section shall be signed by the mortgagor or trustor under penalty of perjury."].)

And, finally—back to our point about the inherent individual operation of the statute—the very structure of section 2923.5, subdivision (b) belies any insertion of a penalty of perjury requirement. The way section 2923.5 is set up, too many people are necessarily involved in the process for any one person to likely be in the position where he or she could swear that all three requirements of the declaration required by subdivision (b) were met. We note, for example, that section 2923.5, subdivision (a)(2) requires any one of three entities (a "mortgagee, beneficiary, or authorized agent") to contact the borrower, and such entities may employ different people for that purpose. And the option under the statute of no contact being required (per § 2923.5, subd. (h))[18] further involves individuals who would, in any commercial operation, probably be different from the people employed to do the contacting. For example, the person who would know that the borrower had

---

[18] We now quote section 2923.5, subdivision (h):

"(h) Subdivisions (a), (c), and (g) shall not apply if any of the following occurs:

"(1) The borrower has surrendered the property as evidenced by either a letter confirming the surrender or delivery of the keys to the property to the mortgagee, trustee, beneficiary, or authorized agent.

"(2) The borrower has contracted with an organization, person, or entity whose primary business is advising people who have decided to leave their homes on how to extend the foreclosure process and avoid their contractual obligations to mortgagees or beneficiaries.

surrendered the keys would in all likelihood be a different person than the legal officer who would know that the borrower had filed for bankruptcy.

The argument *for* requiring the declaration to be under penalty of perjury relies on section 2015.5 of the Code of Civil Procedure, but that reliance is misplaced. We quote all of section 2015.5 in the margin.[19] Essentially the statute says *if* a statement in writing is required to be supported by sworn oath, making the statement under penalty of perjury will be sufficient. The key language is: "*Whenever*, under any law of this state . . . made pursuant to the law of this state, *any matter is required* . . . to be . . . evidenced . . . by *the sworn* . . . declaration . . . in writing of the person making the same . . . such matter *may* with like force and effect be . . . evidenced . . . by the unsworn . . . declaration . . . in writing of such person which recites that it is . . . declared by him or her to be true under penalty of perjury . . . ." (Italics added.) The section sheds no light on *whether* the declaration required in section 2923.5, subdivision (b) must be under penalty of perjury.

---

"(3) A case has been filed by the borrower under Chapter 7, 11, 12, or 13 of Title 11 of the United States Code and the bankruptcy court has not entered an order closing or dismissing the bankruptcy case, or granting relief from a stay of foreclosure."

[19] Code of Civil Procedure section 2015.5 reads in its entirety:

"Whenever, under any law of this state or under any rule, regulation, order or requirement made pursuant to the law of this state, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn statement, declaration, verification, certificate, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may with like force and effect be supported, evidenced, established or proved by the unsworn statement, declaration, verification, or certificate, in writing of such person which recites that it is certified or declared by him or her to be true under penalty of perjury, is subscribed by him or her, and (1), if executed within this state, states the date and place of execution, or (2), if executed at any place, within or without this state, states the date of execution and that it is so certified or declared under the laws of the State of California. The certification or declaration may be in substantially the following form:

"(a) If executed within this state:

" 'I certify (or declare) under penalty of perjury that the foregoing is true and correct':

"

_____ _____
(Date and Place) (Signature)

"(b) If executed at any place, within or without this state:

" 'I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct':

"

_____ _____
(Date and Place) (Signature)

### F. The Wording of the Declaration: Okay if It Tracks the Statute

In light of what we have just said about the multiplicity of persons who would necessarily have to sign off on the precise category in section 2923.5, subdivision (b) that would apply in order to proceed with foreclosure (contact by phone, contact in person, unsuccessful attempts at contact by phone or in person, bankruptcy, borrower hiring a foreclosure consultant, surrender of keys), and the possibility that such persons might be employees of not less than three entities (mortgagee, beneficiary, or authorized agent), there is no way we can divine an intention on the part of the Legislature that each notice of foreclosure be custom drafted.

To which we add this important point: By construing the notice requirement of section 2923.5, subdivision (b), to require only that the notice track the language of the statute itself, we avoid the problem of the imposition of costs beyond the minimum costs now required by our reading of the statute.

### G. Noncompliance Before Foreclosure Sale Affect Title After Foreclosure Sale? No

A primary reason for California's comprehensive regulation of foreclosure in the Civil Code is to ensure stability of title after a trustee's sale. (*Melendrez v. D & I Investment, Inc.* (2005) 127 Cal.App.4th 1238, 1249–1250 [26 Cal.Rptr.3d 413] ["comprehensive statutory scheme" governing foreclosure has three purposes, one of which is " ' "to ensure that a properly conducted sale is final between the parties and conclusive as to a bona fide purchaser" ' "].)

There is nothing in section 2923.5 that even hints that noncompliance with the statute would cause any cloud on title after an otherwise properly conducted foreclosure sale. We would merely note that under the plain language of section 2923.5, read in conjunction with section 2924g, the *only* remedy provided is a postponement of the sale before it happens.

### H. Lender Compliance in This Case? Somebody Is Not Telling the Truth and It's the Trial Court's Job to Determine Who It Is

We have already recounted the conflict in the evidence before the trial court regarding whether there was compliance with section 2923.5. Rarely, in fact, are stories so diametrically opposite: According to the Mabrys, there was no contact at all. According to Aurora, not only were there numerous contacts, but the Mabrys even initiated a proposal by which their attorney would buy the property.

Somebody's not telling the truth, but appellate courts do not resolve conflicts in evidence. Trial courts do. (*Butt v. State of California* (1992) 4 Cal.4th 668, 697, fn. 23 [15 Cal.Rptr.2d 480, 842 P.2d 1240] ["Moreover, Diaz and Bezemek concede the proffered evidence is disputed; appellate courts will not resolve such factual conflicts."].) This case will obviously have to be remanded for an evidentiary hearing.

## I. Is This Case Suitable for Class Action Treatment? No

As we have seen, section 2923.5 contemplates highly individuated facts. One borrower might not pick up the telephone, one lender might call only at the same time each day in violation of the statute, one lender might (incorrectly) try to get away with a form letter, one borrower might, like the old Twilight Zone "pitchman" episode, try to keep the caller on the line but change the subject and talk about anything *but* alternatives to foreclosure, one borrower might, as Aurora asserts here, try to have his or her attorney do a deal that avoids foreclosure, etcetera.

In short, how in the world would a court certify a class? Consider that in this case, there is even a dispute over the basic facts as to whether the lender attempted to comply at all. We do not have, under these facts at least, a question of a clean, systematic *policy* on the part of a lender that might be amenable to a class action (or perhaps enforcement by the Attorney General). This case is not one, to be blunt, where the lender admits that it simply ignored the statute and proceeded on the theory that federal law had preempted it. We express no opinion as to any scenario where a lender simply ignored the statute wholesale—that sort of scenario is why we do not preclude, a priori, class actions and have not expressed an opinion as to whether the Attorney General or a private party in such a situation might indeed seek to enforce section 2923.5 in a class action.

Consequently, while we must grant the writ petition so as to allow the Mabrys a hearing on the factual merits of compliance, we deny it insofar as it seeks reinstatement of any claims *qua* class action. By the same token, in light of the limited right to time conferred under section 2923.5, we also deny the writ petition insofar as it seeks reinstatement of any claim for money damages.[20]

## IV. CONCLUSION

Let a writ issue instructing the trial court to decide whether or not Aurora complied with section 2923.5. To the degree that the trial court's order

---

[20] We express no opinion here as to how any attorney fees issue may play out. Those are for a later day.

precludes the assertion of any class action claims, we deny the writ. If the trial court finds that Aurora has complied with section 2923.5, foreclosure may proceed. If not, it shall be postponed until Aurora files a new notice of default in the wake of substantive compliance with section 2923.5.

Given that this writ petition is granted in part and denied in part, each side will bear its own costs in this proceeding.

Aronson, J., and Ikola, J., concurred.

Petitioners' petition for review by the Supreme Court was denied August 18, 2010, S184386. Chin, J., did not participate therein.